# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Leonard F. Joy
*Executive Director and*
*Attorney-in-Chief*

July 13, 2007

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

**By Hand**

Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States District Court
500 Pearl Street
New York, New York 10007

Re:    **United States v. Huang**
       **06 Cr. 1006 (KMK)**

Dear Judge Karas:

    I write in the above-captioned case to request that the
Court grant Mr. Adoyi's motion to suppress all physical evidence
seized pursuant to the arrest of, and statements made by, Mr.
Adoyi because they are the fruit of an unlawful search and
interrogation.  <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).
Testimony at the suppression hearing made clear that Mr. Adoyi
had virtually no understanding of the limits of police power or
of his own rights under the Constitution and law of the United
States.  As will be discussed below, the agents took insufficient
measures to ensure that Mr. Adoyi understood what was happening
to him or what his rights were.  Acquiescing to their show of
authority, Mr. Adoyi was used by federal agents as a tool to
further their investigation.  The agents' disregard for Mr.
Adoyi's rights must result in the suppression of all statements
and physical evidence recovered from Mr. Adoyi and the premises
of A&B Trading.

    As detailed below, suppression is warranted on four grounds.
First, Mr. Adoyi did not freely give consent to the agents to
search the premises of A&B Trading.  Second, Mr. Adoyi did not
voluntarily waive his Fifth Amendment rights.  Third, the
government provided misleading information to obtain a search
warrant for the second floor A&B Trading storeroom.  Finally, the
written statement prepared by Agent Bratz and signed by Mr. Adoyi
was obtained in violation of the speedy presentment rule.

I.   **Items Seized by the Agents at A&B Trading Should Be
     Suppressed Because Mr. Adoyi Did Not Voluntarily Consent to
     the Search**

     Between 12:30 p.m. and 1:00 p.m. on July 26, 2006, Mr. Adoyi
and two other employees of A&B Trading were working at 146 W.
29th Street in Manhattan when several Secret Service agents
rushed in, at least one with weapons drawn. H1 p. 52, 69; H3 p.
25.[1] The agents took complete physical control of the location
and of Mr. Adoyi, handcuffing him to a chair.  H1 p. 31. Over a
dozen more agents then entered the store.  H1 pp. 56-57.

     Seeking consent to search, Agent Cantwil spoke to Mr. Adoyi.
H1 p. 37.  No notes or documentation of this encounter exists.
According to her testimony, Agent Cantwil could not remember what
words she used when asking Mr. Adoyi for his consent to search,
nor could she recall the wording of his response.  H1 p. 38.
Indeed, she could not even recall whether he was handcuffed
during the conversation.  H1 p. 75.  Instead, Agent Cantwil
acknowledged that she relied on what she knows of her typical
conduct in relaying how her encounter with Mr. Adoyi likely
proceeded. H1 pp. 60-61.

A.   **Mr. Adoyi Did Not Freely Give Consent to Search the Premises
     of A&B Trading**

     The government bears the burden of proving the voluntariness
of consent, and they have not carried that burden here.  State v.
Birkenmeier, 185 N.J. 552 (2006).  The voluntariness of consent
is determined by assessing the totality of the circumstances.
Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  The
circumstances of Mr. Adoyi's encounter with the agents show that
the agents failed to make even minimal efforts to insure the
voluntariness of his consent.  Rather, the testimony reveals a
show of authority followed by Mr. Adoyi's acquiescence.  This, as
a matter of law, requires suppression of all fruits of the
subsequent unjustified search.  See, e.g., United States v.
Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (finding "mere
acquiescence" to show of authority insufficient to establish
valid consent).

-------------------

     [1]    Testimony was heard over the course of three days.  The
transcript for the first day of the suppression hearing, held May
21, 2007, will heretoforth be cited as "H1."  The second day of
testimony, June 5, 2005, will be cited as "H2" and the third day,
June 20, 2007, will be cited as "H3."

2

Mr. Adoyi did not freely consent because he didn't understand that he could refuse consent. He believed he had a duty to comply with the wishes of the officer. H3 p. 30. This perspective, although squarely at odds with American constitutional law and jurisprudence, is deeply ingrained in Mr. Adoyi from his experiences in his native Togo. There, Mr. Adoyi witnessed unchecked acts of police brutality. He believes that Togolese citizens are expected to submit to the will of the police without question. H3 pp. 22-23. The distinction between Togolese and American limits on police power, while in truth perhaps great, was lost on Mr. Adoyi in the fast and frightening first moments of his encounter with the agents at A&B Trading. H3 p. 23.

Second, Mr. Adoyi's obvious lack of proficiency in English exacerbated the already frightening and ultimately coercive circumstances of the encounter. As an initial matter, the record is utterly bereft of any attempt by Agent Cantwil or her many colleagues in the operation to obtain an interpreter for Mr. Adoyi, this despite his obvious lack of proficiency in English. Agent Cantwil attempts to shift the blame for this shortcoming, explaining that Mr. Adoyi "didn't ask" for an interpreter. H3 p. 81. Yet, Mr. Adoyi, fearfully compliant, simply would not have asked because he "didn't know [he] he could ask for an interpreter." H3 p. 33.

Of course, the burden does not shift from the government to demonstrate that Mr. Adoyi's alleged consent was voluntarily and freely given. Indeed, a person's consent is not to be lightly inferred. See United States v. Viale, 312 F.2d 595, 601 (2d Cir. 1963). Yet, the disregard for Mr. Adoyi's need for interpretation, at the scene and afterwards, was total. This neglect compounded the coercive aspects of the encounter.

Valid consent must be the product of a person's "free and unconstrained will." See United States v. Arango-Correa, 851 F.2d 51, 57 (2d Cir. 1988). Here, any consent allegedly obtained by the agents was the product of agents' overwhelming presence matched with Mr. Adoyi's utter incapacity to comprehend the limits of that power. His will was overborne by the sudden and frightening circumstances of his arrest and detention. Informed by his understanding of the unrestrained powers of police in Togo, Mr. Adoyi acquiesced to the overwhelming show of authority presented by the agents in the store.

3

B.    The Eventual Search Exceeded the Reasonable Scope of Any
      Consent Allegedly Given

Even assuming, arguendo, that the government can somehow
establish that Mr. Adoyi comprehended Agent Cantwil's questions
and validly consented to search the premises, it has not carried
its burden to show that the subsequent search was within the
scope of the consent allegedly granted by Mr. Adoyi.    This
failure is, in the first instance, a product of Agent Cantwil's
lack of recollection as to the terms she used to obtain Mr.
Adoyi's alleged consent.  H1 p. 82.    Left only with Agent
Cantwil's general impressions of what took place, the government
has provided what amounts to no evidence whatsoever of the scope
of consent either sought or allegedly granted.

This fundamental problem is compounded here by another
instance of Agent Cantwil shifting to Mr. Adoyi the burden of
ensuring his comprehension of the encounter.  She testified that
Mr. Adoyi "did not qualify" his alleged consent in any way, but
also admitted that she did not seek to clarify her general sense
of Mr. Adoyi's consent once it was allegedly obtained.  H1 p. 84.
This cannot be the basis of a valid search.

The scope of consent to search is determined by what a
reasonable person would have understood to comprise the
searchable area.  Florida v. Jimeno, 500 U.S. 248 (1991). Agent
Cantwil's inconsistent testimony reveals that the scope of her
request for consent to search the premises was vague at best.  H1
p. 38, 83.  By all appearances, Mr. Adoyi simply acquiesced to
Agent Cantwil's apparent authority to conduct the search, and
Agent Cantwil took that as a signal to proceed without further
clarification.  Moreover, her subsequent actions belie her
confidence in the validity of the consent obtained from Mr.
Adoyi.

II.   **All Statements Made by Mr. Adoyi Following his Arrest
      Should be Suppressed Because Mr. Adoyi Did Not Knowingly and
      Intelligently Waive his Fifth Amendment Rights**

After Mr. Adoyi was taken into custody, he was interrogated
and made statements.  These statements were made without a valid
waiver of his rights under the Fifth Amendment.  Miranda v.
Arizona, 384 U.S. 436, 479 (1966).  Agent Cantwil asked Mr. Adoyi
to sign a form waiving his Miranda rights.  H1 p. 35.  Mr. Adoyi
did not sign that form.  H1 p. 35.  This refusal should have, at
minimum, triggered further inquiry into Mr. Adoyi's comprehension
of the Miranda waiver.  Undeterred, Agent Cantwil proceeded to

4

question Mr. Adoyi, later passing this duty on to Agent Bratz, who Agent Cantwil believed had established a better rapport with Mr. Adoyi.  Hl p. 73, 84-85.  Her evidence to support this belief was that Mr. Adoyi would answer Agent Bratz' questions, while he would not respond to Agent Cantwil.  H1 p. 85.

In fact, Mr. Adoyi was not aware that he had the right to remain silent, and has no recollection of any officer or agent informing him of this or any other right protected by Miranda while at A&B Trading.  H3 pp. 31-32.  Unable to read in English, and under pressure during the early stages of the sweep of A&B Trading, Mr. Adoyi did not understand the form Agent Cantwil showed him.  H3 p. 29.  Neither Agent Cantwil nor Agent Bratz ever probed into Mr. Adoyi's comprehension of English or offered the services of an interpreter.

Comprehension of one's rights is a necessary precondition for a voluntary waiver.  See United States v. Bernard, 795 F.2d 749, 751 (9th Cir. 1986) ("[A]ny language difficulties encountered by the defendant are considered to determine if there has been a valid waiver.").  Mr. Adoyi did not comprehend his Fifth Amendment rights, and the agents' efforts to ensure that he did understand those rights did not enhance his understanding.  Those efforts were minimal at best.  As with her testimony about seeking Mr. Adoyi's consent to search, Agent Cantwil had only general impressions and relied upon her "usual practice" of reading the waiver form line-by-line to establish Mr. Adoyi's waiver of his Fifth Amendment rights.  Hl pp. 33-34, p. 80.  These circumstances do not support the view that Mr. Adoyi voluntarily waived his Fifth Amendment rights.

The minimal care taken by the agents to ensure that Mr. Adoyi knowingly and voluntarily waived his Fifth Amendment rights stands in sharp contrast to the extensive subsequent use of Mr. Adoyi in their investigation.  As will be discussed below, Mr. Adoyi was detained for several hours, and the agents made repeated use of his statements, including to locate the A&B Trading storage room.

## III. Items Seized During Execution of the Search Warrant for the Second Floor Should Be Suppressed Because the Search Warrant was Invalid

Despite allegedly having consent to conduct a wide-ranging and extensive search of the premises from a person they purportedly believed was a "manager" of A&B Trading, Agent Cantwil secured a search warrant for A&B Trading's second-floor

storage room.  Indeed, although the agents learned of the location of the storage room from Mr. Adoyi,[2] and had obtained the key to the storage room from Mr. Adoyi (H2 p. 58, H3 p. 33) there is no testimony that Agent Cantwil asked Mr. Adoyi permission to search that storage room.  Instead, late in the investigation, Agent Cantwil sought a search warrant from Magistrate Judge Freeman well after business hours.  H1 p. 68.  On the face of her warrant affidavit, the central basis for Agent Cantwil's belief that the storage room contained "machines for the manufacture" of contraband bags was Mr. Adoyi.  See, Warrant Affidavit, Defense Exhibit D, attached at A, pages 6-7, paragraphs 16, 17, and 18.

Agent Cantwil could not have learned this information from Mr. Adoyi, simply because Mr. Adoyi made no such statement to Agent Cantwil or any other agent.  See, Adoyi Written Statement, Government Exhibit 14, attached at B. According to Agent Cantwil's testimony at the hearing, her conversations with Mr. Adoyi were brief and took place early in the day's investigation.  H1 p. 84.  Agent Bratz then took on the role of Mr. Adoyi's questioner, and his testimony reveals that he was the only agent to question Mr. Adoyi for the rest of the investigation.  H2 p. 36.  Agent Bratz also took Mr. Adoyi's written statement, and testified that it contained everything Mr. Adoyi had told him over the course of the day concerning Mr. Adoyi's understanding of the origins of the bags.  H2 pp. 18-19.  Nowhere in the written statement does Mr. Adoyi allude to bags being manufactured in the storage room, or equipment used to manufacture bags being stored there.  Indeed, he explains that, as far as he knew, a man in a white truck delivered the bags to the store.  He did not know where the bags came from.  See, Adoyi Written Statement, Government Exhibit 14, attached at B.

After agents brought Mr. Adoyi to the second floor and asked him to point out the A&B storeroom, Mr. Adoyi saw agents try different keys on the storage room door.  H3 p. 34.  Manufacturing equipment was found in the storage room, and it appears that the true basis for Agent Cantwil's knowledge of the contents of the storage room was a search of that room, perhaps conducted by another agent, but not the words of Mr. Adoyi.

---

[2]    The agents had believed that A&B Trading kept a storage room on a higher floor, but learned from their interrogation of Mr. Adoyi that the storage room was on the second floor.

**IV.** **Mr. Adoyi's Written Statement Should Be Suppressed Because it was Obtained in Violation of His Right to a Speedy Presentment**

Agent Bratz took a written statement from Mr. Adoyi after executing a written <u>Miranda</u> waiver. That waiver was executed at 10:11 p.m., many hours after Mr. Adoyi's arrest. <u>See</u>, <u>Adoyi Waiver</u>, Government Exhibit 13, attached at C. This written statement, as well as any oral statements taken after delay, must be suppressed as the fruit of a violation of Mr. Adoyi's right to a speedy presentment. The right to speedy presentment before a member of the judiciary after arrest, set forth by the <u>McNabb</u> and <u>Mallory</u> Courts and modified by 18 U.S.C. § 3501(c), requires suppression of a statement obtained during an unjustified delay between arrest and arraignment. <u>McNabb v. United States</u>, 319 U.S. 784 (1943); <u>Mallory v. United States</u>, 354 U.S. 449 (1957); 18 U.S.C.A. § 3501(c); <u>see also</u> <u>United States v. Alvarez-Sanchez</u>, 975 F.2d 1396, 1399 (9th Cir. 1992) <u>rev'd</u> 511 U.S. 350 (1994).

Mr. Adoyi's statement was obtained well beyond the six-hour safe harbor period set forth in 18 U.S.C. § 3501(c). Mr. Adoyi's arrest occurred somewhere between 12:30 p.m. and 1:00 p.m. on July 26, 2006. H1 p. 69. The written statement was taken no earlier than 10:11 p.m. H2 p. 14. Mr. Adoyi was not presented until the next day.

The lengthy delay between Mr. Adoyi's arrest and arraignment was avoidable and deliberate. After allegedly obtaining his consent to search A&B Trading, the agents had no reason to continue to detain Mr. Adoyi on the premises. In addition, the government has not claimed that there was any difficulty in transporting Mr. Adoyi to the nearest magistrate for arraignment, or that an exigency of any kind existed to justify Mr. Adoyi's lengthy detention. The government's failure to promptly arraign Mr. Adoyi violates Section 3501(c). The <u>McNabb-Mallory</u> remedy, preserved by the statute, thus requires that Mr. Adoyi's written confession be suppressed.

Moreover, the written statement is in every way the fruit of the violation of Mr. Adoyi's right to a speedy presentment. Upon presentment, Mr. Adoyi was appointed counsel, he was given an interpreter, his rights and the next stages of federal criminal procedure were explained to him. Bereft of this information, and before giving the written statement, Mr. Adoyi believed that he was being taken to the airport to be sent back to Togo.

## Conclusion

Based on the record before the Court, the government has failed to establish that Mr. Adoyi freely and voluntarily consented to the search of A&B Trading, or waived his rights under the Fifth Amendment. This record does show, however, that the agents provided misleading information to Magistrate Judge Freeman to secure a search warrant for the second floor storage room, and that Mr. Adoyi's written statement was the fruit of a violation of his right to a speedy presentment. I respectfully request that this Court suppress all evidence procured as a fruit of these violations.

Respectfully submitted,

Christopher A. Flood
Attorney for **Bouhari Adoyi**

cc:    Steven C. Lee, Esq.

8

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :

       - v. -                       :

THE PREMISES KNOWN AND DESCRIBED    :
AS THE SECOND FLOOR ROOM AT THE
"INDIA BUILDING" LOCATED AT         :
146 WEST 29th STREET, NEW YORK,
NEW YORK, 10001, AND ANY CLOSED     :
CONTAINERS AND ITEMS CONTAINED
THEREIN.                            :
- - - - - - - - - - - - - - - - - -X
STATE OF NEW YORK                   )
                         )   ss.:
SOUTHERN DISTRICT OF NEW YORK       )

**AFFIDAVIT IN SUPPORT
OF AN APPLICATION FOR
SEARCH WARRANT**

    SARAH E. CANTWIL, being duly sworn, deposes and says:

    1.  I am a Special Agent with the United States Secret
Service ("USSS").  I make this Affidavit pursuant to Rule 41 of
the Federal Rules of Criminal Procedure for the issuance of a
warrant to search THE PREMISES KNOWN AND DESCRIBED AS THE SECOND
FLOOR ROOM AT THE INDIA BUILDING, LOCATED AT 146 WEST 29TH
STREET, NEW YORK, NEW YORK, 10001 ("SECOND FLOOR ROOM").  I have
participated in numerous investigations of criminal activity,
including investigations on the trafficking of counterfeit goods.
During those investigations, I have executed or participated in
the execution of numerous search warrants and seized evidence of
these violations.

    2.   I have participated in the investigation of this
matter, and I am familiar with the information contained in this
affidavit based on my own personal participation in the

*Cantwil*
**3501-C**

investigation, my review of documents and video, conversations I have had with other law enforcement officers about this matter, and my training and experience as a USSS agent. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search THE SECOND FLOOR ROOM described below, I have not included the details of every aspect of the investigation in this affidavit. Except where otherwise indicated, the actions, conversations, and statements of others included within this affidavit are reported in substance and in part.

3.    As set forth more fully below, and in the Complaint in <u>United States v. Angela Hung, Gen LNU, and Mohammed LNU</u>, 06 Mag. 1060 (attached hereto as Exhibit A), there is probable cause to believe that ANGELA HUNG, GEN LNU, and MOHAMMED ADOYI, are engaged in a conspiracy to knowingly traffic counterfeit handbags, in violation of Title 18, United States Code, Sections 371 and 2320. Moreover, I submit that there is probable cause to believe that now located in THE SECOND FLOOR ROOM are fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Section 371 (conspiracy to traffic in counterfeit goods). Such evidence consists of the items set forth in Schedule A to the Search Warrant. In addition, such evidence may be stored in secure locations like safety deposit boxes, safes, key-lock strong boxes, and other types of locked or

2

closed containers in an effort to prevent the discovery or theft of these items.

### THE SECOND FLOOR ROOM

4.  THE SECOND FLOOR ROOM, which I respectfully submit there is probable cause to believe has evidence and instrumentalities of violations of federal law, is a room in the India Building, that is located at 146 West 29th Street, New York, New York.

5.  Based on my conducting visual surveillance of THE SECOND FLOOR ROOM and conversations with MOMHAMMED ADOYI, I know that the SECOND FLOOR ROOM is in the "India Building" located at 146 West 29th Street, adjacent to A&B Trading, Inc ("A&B Trading").  The building is a twelve story cinder block building with the main entrance in between a freight elevator another storefront, all facing 29th Street.  The SECOND FLOOR ROOM is on the second floor of this building, with a metal door immediately to the left of exiting the elevator.  The door to the SECOND FLOOR ROOM is also directly opposite the stairwell on the second floor.

### PROBABLE CAUSE THAT FRUITS, INSTRUMENTALITIES, AND EVIDENCE OF THE CRIME ARE LOCATED IN THE SECOND FLOOR ROOM

6.  USSS has been investigating a conspiracy to traffic in counterfeit bags originating out of 146 West 29th Street, New York, New York.  I have spoken with other law enforcement agents and representatives of United States Citizenship and Immigration

3

Services ("Immigration") and have learned the following:

7.    On or about May 17, 2006, a confidential informant
(the "CI") informed an undercover USSS agent ("Agent-1") with
information about counterfeit handbags that were being sold from
A&B Trading, Inc. ("A&B Trading") at 146 West 29th Street in New
York City. Later that day, the CI and an undercover Secret
Service agent ("Agent-1") visited A&B Trading at 146 West 29th
Street in New York City. During this visit, Agent-1 arranged a
purchase with two individuals, an African male who introduced
himself as "Mohammed," later identified as MOHAMMED ADOYI and an
Asian male who was later identified as GEN LNU. Agent-1 asked to
purchase six "Coach" handbags, twenty-four "Burberry" handbags,
and six "Christian Dior" handbags. GEN LNU told Agent-1 that the
total price was $480 and told Agent-1 that he could pick up the
handbags in an hour.

8.    Agent-1 returned to A&B Trading approximately one
hour later and MOHAMMED ADOYI provided Agent-1 with a black
garbage bag filled with the handbags that he had ordered.

9.    On or about June 7, 2006, Agent-1 returned to A&B
Trading. During this visit, Agent-1 arranged another purchase of
counterfeit handbags with two individuals, MOHAMMED ADOYI, and an
Asian female who was later identified as ANGELA HUNG. During the
course of this visit, Agent-1 placed an order with MOHAMMED ADOYI
for 12 "Coach" handbags, 20 "Christian Dior" handbags, and 12

4

"Burberry" handbags for a total of $804.  After accepting
payment, MOHAMMED ADOYI then told Agent-1 to return in a half
hour to pick up the handbags.

10.  Approximately a half hour later, Agent-1 returned
to A&B Trading and MOHAMMED ADOYI provided him with black trash
bags filled with the handbags that Agent-1 had ordered.  Both
MOHAMMED ADOYI and ANGELA HUNG, who was also inside A&B Trading,
instructed Agent-1 to go to the corner of 29th Street and 7th
Avenue so that MOHAMMED ADOYI could provide Agent-1 with two more
large bags filled with the remainder of the handbags that he had
ordered.  Agent-1 then left A&B Trading, went to his car, and
drove to the corner of 29th Street and 7th Avenue.

11.  When Agent-1 left A&B Trading, I, along with other
USSS agents conducted visual surveillance of the area around A&B
Trading.  I observed MOHAMMED ADOYI enter a door to the building
immediately to the left of A&B Trading, that was marked as the
"India Building" and was also marked with the address of 146 West
29th Street.  I then observed MOHAMMED ADOYI leaving the India
Building five minutes later with two large black garbage bags and
walking toward the corner of 29th Street and 7th Avenue.

12.  I then followed MOHAMMED ADOYI and observed him
meet, Agent-1 at the corner of 29th Street and 7th Avenue.  I
observed MOHAMMED ADOYI hand Agent-1 two large garbage bags
filled with the counterfeit handbags that he had ordered.

5

13. On or about July 24, 2006, Agent-1 returned to A&B Trading. During this visit, Agent-1 arranged another purchase of counterfeit handbags with two individuals, MOHAMMED ADOYI, and GEN LNU. During the course of this visit, Agent-1 placed an order with MOHAMMED ADOYI for 22 "Coach" handbags for a total of $374. After accepting payment, MOHAMMED ADOYI then told Agent-1 to return in a half hour to pick up the handbags.

14. Agent-1 returned to A&B Trading approximately a half hour later and engaged in a conversation with MOHAMMED ADOYI and GEN LNU. During this conversation, MOHAMMED ADOYI provided Agent-1 with a large trash bag filled with the handbags that he had ordered. Agent-1 then spoke to MOHAMMED ADOYI and GEN LNU arranged a large purchase of 900 counterfeit handbags for July 26, 2006.

15. On July 26, 2006, Agent-1 returned to A&B Trading and arranged a purchase of approximately 1000 "Coach," "Burberry," and other brand name bags with MOHAMMED ADOYI. MOHAMMED ADOYI then instructed Agent-1 to return in an hour to complete the transaction.

16. Approximately one hour later, Agent-1 returned to A&B Trading, and was informed that there two boxes of handbags at A&B Trading and the remainder of Agent-1's order of handbags was "next door." At this time, MOHAMMED ADOYI was arrested at A&B Trading by USSS agents and read his Miranda rights. MOHAMMED

6

ADOYI waived his Miranda rights and stated in sum, substance, and in part that there was a room on the second floor in the building next door where counterfeit bags and presses used to manufacture counterfeit bags were stored.

17.   MOHAMMED ADOYI then accompanied USSS agents to the building next door that was marked as the "146 India Building" at 146 West 29th Street, New York, New York (the "India Building"). He took the elevator up to the Second Floor of the India Building.   When he exited the elevator, he indicated that the first door on the left, directly across the hall from the stairwell, was the room where A&B Trading stored counterfeit handbags and presses used to manufacture counterfeit handbags.

18.   USSS agents also spoke to the owner of the India Building (the "Owner") who confirmed that the second floor room that MOHAMMED ADOYI had identified as storing counterfeit handbags and presses used to manufacture counterfeit handbags was currently being leased by A&B Trading.

CONCLUSION

19.   Based on the foregoing, I respectfully request that the Search Warrant sought in this affidavit issue pursuant to Rule 41 of the Federal Rules of Criminal Procedure, permitting authorized agents or officers to enter THE SECOND FLOOR ROOM

therein to search for and seize the items listed in Schedule A to the Search Warrant.

SARAH E. CANTWIL
Special Agent
United States Secret Service

Subscribed and sworn before me
this 26th day of July, 2006.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT B

PAGE 1 OF 2

**AFFIDAVIT**        ADOYE STATEMENT

United States of America

Southern District of New York                    File No. _____

I Bouhari Adoyi _____, stated that I have been advised by SA Todd Bratz,
United States Secret Service, that under the provisions of the Constitution I have certain rights:
The absolute right to remain silent, and that anything I say can be used against me in the court of
law or any other proceedings; that I have the right to consult with an attorney before answering
any questions or making any statements, and that if I cannot afford an attorney and want one, that
one can be appointed for me before I say anything; and if I decide to make any statements now,
without an attorney present, I have the right to stop the questioning at any time.

Knowing and understanding these rights, I hereby make the following statement:

I, Todd Bratz, am writing this statement for
Bouhari Adoyi. Bouhari Adoyi requested that I write this statement
for him because he does not write in English well. The following
statement is a transcription of Adoyi's words.

I have worked for A+B Trading Company at 146 W. 29th St in
New York since August of 2004. I was hired by and continue to
work for a Chinese woman named Angela. There is another Chinese man

I have read the foregoing statement consisting of __1__ page(s). I have been given an opportunity
to make corrections. I fully understand this statement and it is true and correct to the best of my
knowledge.                                       over

                                        front and back  AA

I made this statement freely and voluntarily, without any threats, rewards or promises of
immunity in return for it.

Subscribed and sworn to before
me this day 7/26, 20 06,
at US Customs St. Bridge, NY

_____
Signature

Secret Agent
Title                                    Authority to Administer Oath
                                         Section 303, Title 5, U.S.C.

Witnessed:

Todd Bratz  Todd Bratz Special Agent    07/26/06

named Raymond, and a mexican named Joel. When the police and US Secret Service came to A+B Trading today, I was working with Raymond and Joel. At A+B Trading my job is to take care of customers, fix the boxes of merchandise in the store, and get the fake merchandise from the storage room on the second floor of 146 W 29TH St. When a customer orders those items.

When I began working at A+B Trading, Raymond showed me the keys to the second floor, storage room of 146 W 29TH St. He showed me this storage room where the fake merchandise is kept. This fake merchandise includes fake purses, bags, and women's wallets. I do not know where this fake merchandise comes from, but I know this merchandise is delivered to A+B Trading by a korean or chinese man driving a light colored truck.

A set of keys were found in A+B Trading and were shown to me. I was told by the US Secret Service agents that they have seen me go into the entrance of 146 W 29TH St where the elevators are located. I showed the US Secret Service agents the door of the storage room where the fake merchandise is kept on the second floor of 146 w 29th St.

Raymond and Angela are only two people who handle the money from customers. Angela pays me every two weeks. I earn $55 each day.

I know that pieces of paper with pictures of the fake merchandise exists. This pictures are used for customers to choose what they would like to buy.

# EXHIBIT C

# WARNING AND CONSENT TO SPEAK

## WARNING OF RIGHTS

You must understand your rights before we ask you any questions.

You have the right to remain silent.

Anything you say can be used against you in court, or other proceedings.

You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning

If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.

> I have read this statement of my rights and it has been read to me, and I understand what my rights are.

Date _____07 - 26 - 06_____     _____
                                              Signature

Time _____10.11 PM._____

## WAIVER

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions.

Date _____07 - 26 - 06_____     _____
                                              Signature

Time _____10.11 P.m._____

## CERTIFICATION

I hereby certify that the foregoing Warning of Rights and Waiver were read by me to the above signatory, and that he also read it and has affixed his signature hereto in my presence.

_____Todd Bratz_____          _____
        Witness                              Signature

_____
        Witness

UNITED STATES SECRET SERVICE
This form was electronically produced via OmniForm by USSS/ADMIN/ARNOFIARS

SSF 1737B 01/83)