# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Leonard F. Joy
*Executive Director*

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

August 27, 2007

.**By Hand & ECF**
Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States District Court
500 Pearl Street
New York, New York 10007

**Re:**   **United States v. Huang**
          **06 Cr. 1006 (KMK)**

Dear Judge Karas:

I write to briefly respond to the arguments set forth in the government's letter of July 20, 2007.

It was not an accident that A & B Trading was searched on July 26, 2006. With as many as fifteen agents on the scene (May 21, 2007 Tr. (5/21 Tr.) 30), it was clear that the task force intended more than simply to arrest the employees. Moving in decisively, rapidly, and in force, the agents pushed into the store and detained each of the occupants while others, at least one with a gun drawn, swept the area. In a matter of moments, the interior of A & B Trading was transformed from a laconic storefront into a hive of police activity. Bouhari Adoyi, who seconds before had stepped to the exterior door for some fresh air, found himself in handcuffs and confronted with questions in English by Agent Sarah Cantwill and others. A document was involved, but it too was in English, a language that Mr. Adoyi could not read. Mr. Adoyi did not understand what was happening, and tried to direct the agents to his boss. (June 20, 2007 (6/20) Tr. 30). Seconds later, the encounter was over (5/21 Tr. 81-2), and a very long day of detention began for Mr. Adoyi, who watched the search apprehensively and wondered what was going to happen to him.

## I.  Mr. Adoyi Did Not Waive His Rights Under the Fifth Amendment

Mr. Adoyi was not equipped to deter the agents from their object. He did not have the experience, the understanding, or the skills to grasp what was happening to him. More importantly, he had no idea that the agents' powers were limited by the Fourth Amendment to the Constitution. Absent any relevant knowledge, Mr. Adoyi could only do what he wrongfully

1

believed he had a duty to do: acquiesce to the agents' display of authority.

Because of what he had seen and learned in his native Togo, Mr. Adoyi believed that he had a duty to answer the questions of any police officer who wanted to speak with him. (6/20 Tr. 31). This mistaken belief also extended to encompass the agents' power to search. Mr. Adoyi wrongfully believed that the agents had the power to search any place that they wanted to search. Additionally, however, Mr. Adoyi understood his limited role as a worker at A & B Trading, and would not usurp what he believed was the power of his boss. Accordingly, while he answered the questions the agents put to him, and was otherwise cooperative, he did not grant consent to the agents to search the store.[1] (6/20 Tr. 30-1).

Mr. Adoyi's inaccurate conclusion as to the scope of the agents' authority was exacerbated by a profound language barrier. In the two years he was in the United States before his arrest, Mr. Adoyi had learned what English he could from work, from the television, and from various encounters on the street. (6/20 Tr. 16). Although he often spoke a brand of English at work, it was a halting and primitive version that is fully displayed in the videotape submitted by the government.[2]

While the government submits the videotape to somehow show that Mr. Adoyi in fact spoke English, Mr. Adoyi's use of a rudimentary English to conduct transactions at his job has never been denied. But, of course, to engage in repetitive and familiar tasks involving a set list of inventory using a foreign language does not equate with comprehending that foreign language as it is used to convey complex and unfamiliar Miranda warnings, or to ask for consent. The recording does not establish that Mr. Adoyi understood what was being asked of him at the time of his arrest. At minimum, however, it does suggest that Mr. Adoyi would have benefitted from French translation during his interrogation. And while the recording and others like it were

---

[1] This is not the same thing, as the government appears to suggest, as Mr. Adoyi having apparent authority to consent. Whether the agents could credibly look to Mr. Adoyi as the "manager" of A & B Trading, Mr. Adoyi would not look to himself, but would instead look to his boss, to grant consent to the agents. It is not a question of law whether Mr. Adoyi exhibited common authority, but a question of fact as to whether Mr. Adoyi gave consent. He in fact did not consent to the search, precisely because he did not believe it was in his power to grant consent. Moreover, the totality of the circumstances, especially those created by the agents, suggest that no agent could fairly or reasonably rely on Mr. Adoyi's reaction as a valid and freely-given consent.

[2] Over the course of the recording, while plainly struggling to follow the basic transactional demands of the undercover agent, Mr. Adoyi speaks little more than one hundred and fifty words, including slang, conjunctions, and pronouns. See, Defense Exhibit E, introduced at hearing and attached as Exhibit A.

available to the agents, they nevertheless elected not to arrange for an interpreter.[3]

The obvious practical solution to the language barrier belies its constitutional importance. The premise underlying Miranda, that the accused should understand his constitutional right not to assist the government in its prosecution of him, is itself predicated upon the accused's comprehension of the language in which the warnings are spoken. No waiver could be knowing, nor freely given without such basic communication.[4] An understanding of this most basic, fundamental principle underlies Federal Rule of Criminal Procedure 28, and infuses every court appearance in which the services of an interpreter are utilized. This appropriate level of care to ensure that each of the accused comprehends the proceedings is rendered farcical by the agents' complete disregard of Mr. Adoyi's comprehension at the alleged waiver.[5] Indeed, Agent Cantwill gave such minimal attention to the waiver that she now remembers neither her own words asking for consent, nor Mr. Adoyi's words allegedly granting consent.[6]

Much was stacked against Mr. Adoyi in those few seconds. He had no experience or factual understanding of American law or criminal procedure. (6/20 Tr. 13). Indeed, his experiences in Togo had led him to conclude that police would utilize violence if he did not comply with their demands. (6/20 Tr. 22). He had been threatened with deportation. (6/20 Tr. 31; June 5, 2007

---

[3] At least one other jurisdiction requires, for a statement of a non-English speaker to be admissible, the police to secure the assistance of a qualified interpreter. See, e.g., D.C.Code § 31-2702(e); see also, Barrera v. United States, 599 A.2d 1119, 1131 (D.C. 1991).

[4] Additionally, a putative waiver of this sort would be unreliable as a matter of evidence. Its introduction, or that of its fruits, would thus violate due process. See, e.g., Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)

[5] That Agent Cantwill used a form in the course of her encounter with Mr. Adoyi does not resuscitate an otherwise coerced waiver. It would elevate form over function to find a voluntary waiver because, as Agent Cantwill testified, she used a form to prevent her words from later being called into question. (5/21 Tr. 33). Nothwithstanding, the governments efforts to transform the shield of the Miranda form into a sword, the writing casts no light on the fundamental question of comprehension.

[6] The failure of the agents to record the alleged consent in any way undermines a subsequent independent analysis of whether a valid consent could have been given. The government only offers testimony as to Agent Cantwill's general practices and as to her recollection of the circumstances of the alleged consent. On the critical question of exactly what words were said, as opposed to Agent Cantwill's perception of the general direction of the conversation, the government offers no evidence at all. Deprived of such critical information, the government has not carried its burden to show that consent was freely given by Mr. Adoyi, or that the agents could reasonably rely upon his response to conclude that voluntary consent had been given.

(6/5) Tr. 43). Far from understanding that he had a right to refuse assistance to the government, he mistakenly believed that he had a duty to speak to the police. (6/20 Tr. 22). The store was full of officers. He was in handcuffs. He had only recently learned that the task force were not bandits, but police. He had seen guns. Now he was being confronted in a foreign language by a professional officer trained to conduct interrogations. (6/5 Tr. 63-5).

This was sudden, unexpected, and terrifying. Predictably, Mr. Adoyi was "lost." (6/20 Tr. 26). It is unreasonable to conclude that any consent allegedly given by Mr. Adoyi under these circumstances was the product of his free will.

Less still can the conclusion reasonably be drawn that the scope of any consent allegedly given was unrestricted. As an initial matter, Mr. Adoyi could not understand that he had the power to limit the reach of any consensual search because he did not know that he had the power not to consent in the first place. His consent, if any, was the product of the agents' show of authority. Under the unique circumstances of this case, it would be unfair to expect Mr. Adoyi to have both the knowledge and the presence of mind to understand that he could acquiesce to that authority by degrees, by limiting his consent to certain areas and not to others.

## II.    Denial of Speedy Presentment

For the balance of the remainder of the day, and well into the night, Mr. Adoyi was kept handcuffed to a chair under the direct scrutiny of one of the many agents on the scene. The search proceeded, and occasional questions were directed to Mr. Adoyi through the person of Agent Todd Bratz. Much later in the evening, when, despite having predicated an exhaustive search over the course of hours upon Mr. Adoyi's alleged consent, Agent Cantwill elected to seek judicial approval of the search, she simply traveled the short distance from A & B Trading to 500 Pearl Street, where she swore out a warrant before Magistrate Judge Freeman, who was on duty at the time. It was past 9 p.m.

From all appearances, no effort whatsoever was made to present Mr. Adoyi on July 26, 2006. This delay was both unreasonable and utterly unnecessary. July 26, 2006 was a Wednesday, and a magistrate was on duty the entire work day. One was available after hours, as demonstrated by Agent Cantwill's success in securing a warrant. But instead of observing Mr. Adoyi's right to a speedy presentment, while Agent Cantwill went to court for a warrant, Agent Bratz took Mr. Adoyi to Brooklyn to get a written statement. (6/5 Tr. 56).

There is no legitimate excuse for the agents' failure to observe Mr. Adoyi's right to a speedy presentment. The courthouse was staffed and nearby. There were a large number of agents on the search team who could have transported Mr. Adoyi to court. There was absolutely no exigency justifying the delay.

Indeed, there was no legitimate reason that Mr. Adoyi should have been detained for so long.

According to Agent Bratz, Mr. Adoyi spent most of the day handcuffed to the chair without anyone talking to him. While the agents continued to extract information from Mr. Adoyi during the course of the day, investigation is not a basis for overlooking Mr. Adoyi's rights. See United States v. Perez, 733 F.2d 1026, 1036 (2d Cir. 1984).

While the government suggests that simply exceeding the six-hour window set forth in 18 United States Code § 3501(c) does not compel exclusion of the fruits of the violation, exclusion is the only appropriate remedy where no legitimate reason, be it investigative, shortage of manpower, lack of an available judicial officer, or distance from the courthouse justifies the denial to Mr. Adoyi a speedy presentment. Indeed, even where there are some justifications for delay, exclusion is appropriate on the violation of the six-hour window alone. See Perez, supra.

Here, the unjustified delay directly produced the written statement attributed to Mr. Adoyi. At the time the written statement was taken, Mr. Adoyi was emotionally distraught and in pain. (6/20 Tr. 37). Devoid of any knowledge of American criminal procedure and bereft of guidance, he did not know that he would ever come before this or any other Court. (6/20 Tr. 39). In fact, he believed that he was being transported back to his country.[7] He was tired. He was terrified, and he felt that he was being singled out. (6/20 Tr. 37). Worn down by the day's events, Mr. Adoyi participated in Agent Bratz' efforts to get a written statement. (6/5 Tr. 56). Those efforts began nearly ten hours after Mr. Adoyi's arrest, shortly after Agent Cantwill left 500 Pearl Street.

### III.    Agent Cantwill's Affidavit was Misleading

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing". Delaware v. Franks, 438, U.S. 154, 164-165, citing, United States v. Halsey, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966) (emphasis in original). The testimony at the evidentiary hearing held in this case, in conjunction with documentary evidence provided in discovery, demonstrate that the facts averred to by Agent Cantwill in her Affidavit in Support of a Search Warrant (hereinafter "Affidavit") were not true. Pursuant to Franks and its progeny, the fruits of the search of the India Building's second floor must be suppressed.

On July 26, 2006, Bouhari Adoyi told Agent Bratz that he did not know where the allegedly counterfeit bags came from, but that he knew it was delivered to A & B Trading by a Korean or Chinese man driving a light-colored truck. (See, Adoyi Statement, attached as Exhibit B at p.2). That was all Mr. Adoyi told the agents regarding his knowledge of the origin of the bags. (6/5 Tr. 59-61). He only spoke to Agent Bratz during the day. (6/5 Tr. 37). He did not tell the agents

---

[7] While the government's witnesses describe the interactions at A & B Trading as being conducted in calm and conversational tones, Joel Meza, a defense witness, experienced something very different. Like Mr. Adoyi, he was threatened with deportation, and was actually struck by an officer while in custody. (6/20 Tr. 5-6).

anything about machines used to manufacture the bags. Indeed, Mr. Adoyi never told the agents that there were machines in the upstairs storage room at the India building. (6/20 Tr. 36).

In her affidavit of July 26, 2006, at paragraph 16, Agent Cantwill averred that "Mohammed Adoyi waived his Miranda rights and stated, in sum, substance, and in part that there was a room on the second floor in the [India Building] where...presses used to manufacture bags were stored."[8]

The affidavit is misleading. Whatever the actual source of Agent Cantwill's information, it was not in fact what she averred to Magistrate Judge Freeman.[9]  What has been established by testimony at the hearing is that keys were taken from the person of Mr. Adoyi. (6/20 Tr. 33).  Mr. Adoyi was taken to the second-floor hallway of the India Building, and, while handcuffed, he was directed to point out which door belonged to A & B Trading. (6/20 Tr. 34).  He nodded in the direction of A & B's door (6/5 Tr. 58; 6/20 Tr. 34) .  Agents then tried out at least two keys before Mr. Adoyi was brought back downstairs. (6/20 Tr. 35).

The agents knew that Mr. Adoyi had access to the second-floor room.  They had kept him around without apparent reason since his arrest.  They even asked him to show them the door.  Why, under these circumstances, in which Mr. Adoyi was cooperative and believed to be "a major part of the operation" (5/21 Tr. 36), where Mr. Adoyi had already allegedly given broad and unqualified consent, would the agents cease operations and seek the approval of Magistrate Judge Freeman at 9 or 9:30 p.m.?  Moreover, the agents stepped gingerly around this issue.  For example, in the written statement the reference to the keys recovered from Mr. Adoyi is curiously non-committal.  Additionally, despite clarity as to other mundane aspects of the long day's investigation (See, e.g. 6/5 Tr. 73-5), Agent Bratz had no memory of the events in the hallway of the second floor of the India Building.  (6/5 Tr. 59).

Finally, it is far from speculation to conclude that the agents gained knowledge of the contents of the room through a surreptitious search.  They simply had no other means of finding out.

---

[8] The hoary qualifier, "in sum, substance, and in part", may direct the reader away from any conclusion about the completeness of Mr. Adoyi's alleged statements.  It does not, as the government seems to urge, eclipse the fundamental definition of the verb "to state", which is to express in words.  Nor does it modify the timing of Mr. Adoyi's alleged statements.  Reading paragraph 16 of Agent Cantwill's affidavit in context with paragraph 17, however, it is clear that Mr. Adoyi is alleged to have made the statement prior to being brought to the second floor of the India Building.  Yet the testimony offered by the government at the hearing contradicts this claim.

[9] Mr. Adoyi need not allege that Agent Cantwill herself knowingly made a deliberate or recklessly misleading statement.  See, e.g., United States v. Kyllo, 37 F.3d 526 (9th Cir. 1994); United States v. DeLeon, 979 F.2d 761 (9th Cir. 1992); United States v. Calisto, 83 F.2d 711 (3d Cir. 1988); United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984).

Absent the misrepresentation of Mr. Adoyi's statement, Agent Cantwill's affidavit does not set forth facts sufficient to find probable cause that the storage room on the second floor of the India Building contained evidence, and no exigency or exceptional circumstances justified the search. Accordingly, the fruits of the falsely-justified search of the second floor storage room of the India Building must be suppressed.[10]


**Conclusion**

Mr. Adoyi's experiences in this case were needlessly severe, and the behavior of the agents leaves much to be desired. Mr. Adoyi was no match for the agents, and in fact had no comprehension of his right to refuse consent to search or to remain silent. The government has put forth scant evidence of the putative waivers themselves, and the record on the surrounding circumstances of those waivers does not support the government's claim that Bouhari Adoyi understood what was happening to him and freely waived his rights. On this record, the government has failed to carry its burden to show that the fruits of those alleged waivers are admissible. Moreover, the unjustified denial of Mr. Adoyi's right to a speedy presentment, and misrepresentations in the warrant application call for exclusion of the fruits of those violations. On Mr. Adoyi's behalf, I respectfully request that all statements and tangible evidence derived from the agents' disregard of Mr. Adoyi's rights under the Fourth and Fifth Amendments be suppressed.

Respectfully submitted,

Christopher A. Flood
Attorney for **Bouhari Adoyi**


cc:     Steven C. Lee, Esq.

---

[10] In the alternative, Mr. Adoyi requests a <u>Franks</u> hearing.

7

**BOUHARI ADOYI WORD COUNT: GOVERNMENT EXHIBITS 12 &13 (156 WORDS)**

| | | |
|---|---|---|
| 'cuz | double | many |
| about | down | maybe |
| almost | each | me |
| also | easy | mean |
| always | everything | minute |
| another | explain | money |
| Anwar | finish | much |
| as | first | my |
| because | for | name |
| before | get | need |
| big | give | new |
| black | go | now |
| both | gonna | number |
| bought | good | off |
| box | goodness | okay |
| boxes | got | on |
| brother | grey | only |
| brown | handle | open |
| but | have | order |
| buy | he | orders |
| by | he's | pay |
| call | Hey | perfect |
| came | hour | phone |
| camera | how | picture |
| can | hundred | pieces |
| change | I'm | pray |
| check | inside | price |
| Christian Dior | is | receipt |
| clean | it | same |
| coach | it's | see |
| come | just | sell |
| comes | know | separate |
| copy | last | set |
| count | let | show |
| course | like | sizes |
| didn't | look | small |
| dollar | Louis Vuitton | so |
| don't | make | somebody |

**BOUHARI ADOYI WORD COUNT: GOVERNMENT EXHIBITS 12 &13 (156 WORDS)**

| |
|---|
| somewhere |
| soon |
| star |
| style |
| sure |
| take |
| talk |
| tell |
| that |
| that's |
| then |
| these |
| they |
| thing |
| this |
| thousand |
| time |
| times |
| today |
| together |
| told |
| too |
| took |
| truck |
| understand |
| unit |
| us |
| wallet |
| wanna |
| want |
| we |
| what |
| which |
| why |
| will |
| worry |
| write |
| Yeah |

| |
|---|
| yes |
| yet |
| you |
| your |

PAGE 1 of 2

**AFFIDAVIT**

ADOYI STATEMENT

United States of America

__Southern__ District of __New York__            File No. _____

I __Bouhari Adoyi__, stated that I have been advised by SA __Todd Bratz__, United States Secret Service, that under the provisions of the Constitution I have certain rights: The absolute right to remain silent, and that anything I say can be used against me in the court of law or any other proceedings; that I have the right to consult with an attorney before answering any questions or making any statements, and that if I cannot afford an attorney and want one, that one can be appointed for me before I say anything; and if I decide to make any statements now, without an attorney present, I have the right to stop the questioning at any time.

Knowing and understanding these rights, I hereby make the following statement:

I, Todd Bratz, am writing this statement for Bouhari Adoyi. Bouhari Adoyi requested that I write this statement for him because he does not write in English well. The following statement is a transcription of Adoyi's words.

I have worked for A+B Trading Company at 146 W. 29TH St in New York since August of 2004. I was hired by and continue to work for a Chinese woman named Angela. There is another chinese man

I have read the foregoing statement consisting of __1__ page(s). I have been given an opportunity to make corrections. I fully understand this statement and it is true and correct to the best of my knowledge.

over

front and back  AD

I made this statement freely and voluntarily, without any threats, rewards or promises of immunity in return for it.

Subscribed and sworn to before me this day __7/26__, 20 __06__, at __US Courts ST. Baltimore, NY__

_____
Signature

_____
Title                Authority to Administer Oath.
                     Section 303, Title 5, U.S.C.

Witnessed:

_Todd Bratz_ Todd Bratz - Special Agent   07/26/06

named Raymond, and a mexican named Joel. When the police and US Secret Service came to A+B Trading today, I was working with Raymond and Joel. At A+B Trading my job is to take care of customers, fix the boxes of merchandise in the store, and get the fake merchandise from the storage room on the second floor of 146 w 29TH st. When a customer orders those items

When I ~~began~~ working at A+B Trading, ~~Raymond~~ showed me the keys to the second floor, storage room of 146 w 29TH St. ~~He~~ showed me this storage room where the fake merchandise is kept. This fake merchandise includes fake purses, bags, and women's wallets. I do not know where this fake merchandise comes from, but I know this merchandise is delivered to A+B Trading by a Korean or chinese man driving a light colored truck.

A set of keys were found in A+B Trading and were shown to me. I was told by the US Secret Service agents that they have seen me go into the entrance of 146 w 29TH St where the elevators are located. I showed the US Secret Service agents the door of the storage room where the fake merchandise is kept on the second floor of 146 w 29TH st.

Raymond and Angela are the only two people who handle the money from customers. Angela pays me every two weeks. I earn $55 each day.

I know that pieces of paper with pictures of the fake merchandise exists. This pictures are used for customers to choose what they would like to buy.