

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 1, 2008

**BY HAND**

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
500 Pearl Street
United States Courthouse
New York, New York 10007

      Re:  <u>United States v. Angela Huang, et al.</u>
            S2 06 Cr. 1006 (RJS)

Dear Judge Sullivan:

      The Government respectfully submits this letter in response to the objections to the Presentence Report ("PSR") submitted by defendants Zhi Jun Huang and Angela Huang. In view of the factual disputes raised by the defendants, which are summarized below, the Government respectfully submits that a <u>Fatico</u> hearing will be required before sentencing the defendants. The Government also notes its own objection to the PSR's Guidelines calculation for Angela Huang relating to the enhancement for her leadership role pursuant to Section 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines"). Because the criminal activity involved five or more participants, a four-level increase rather than a two-level increase is warranted.

    I.    **The Dispute As To Loss Amount**

      The PSR determined that because the loss amount in this case was $2,410,760, a 16-level increase in the offense level was warranted pursuant to Guidelines Sections 2B5.3(b)(1)(B) and 2B1.1(b)(1)(I). That valuation was, in turn, based on the number of counterfeit bags that were purchased by an undercover agent from the defendants in the A&B Trading store located at 146 West 29th Street, as well as the number of counterfeit bags seized

Honorable Richard J. Sullivan
September 1, 2008
Page 2

from A&B Trading's storage room in the building next door (a combined total of 4,907 counterfeit bags), multiplied by the retail value of the genuine bags. A spreadsheet showing that calculation is attached as Exhibit A hereto.[1] The defendants argue that the bags should not be valued at the retail value of the genuine items, rather they should be valued at the price at which the undercover agent purchased the bags from the defendants, namely between $12 and $17 a bag. See Letter from J. Jeffrey Weisenfeld to the Honorable Richard J. Sullivan at 2 (filed Aug. 14, 2008) ("Weisenfeld Letter"); Letter from Stacey Van Malden to the Honorable Richard J. Sullivan at 2 (filed Aug. 21, 2008) ("Van Malden Letter").

Guidelines Section 2B5.3(b)(1)(B) provides that "[i]f the infringement amount . . . exceeded $5,000, increase [the defendant's offense level] by the number of levels from the table in § 2B1.1 (Theft, Property Destruction and Fraud) corresponding to that amount." Application Note 2 directs that the "infringement amount" is "the retail value of the infringed items, multiplied by the number of infringing items" where:

> The infringing item . . . is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item . . .

U.S.S.G. § 2B5.3, Appl. Note 2(A)(i).

Courts have repeatedly used the retail value of the infringed item to value the loss for Guidelines purposes in

---

[1] Defendant Angela Huang states that it is "unknown" whether all of the "1000s" of bags seized were counterfeit, or whether some were legitimate handbags with no designer label. Van Malden Letter at 2. It should be noted that *all* of the 4,907 bags on the attached spreadsheet are counterfeit – they have attached to or imprinted on them marks that are identical to or substantially indistinguishable from the registered mark of the victim companies. In fact, the A&B Trading storage room also contained numerous additional tags and labels for Coach, Burberry, and Gucci, along with presses to imprint the designer names on generic bags. Such tags and labels may additionally be considered by the Court in determining the appropriate loss amount, see U.S.S.G. § 2B5.3, Appl. Note 2(A)(vii), although they have not been included on the attached spreadsheet and do not currently form any part of the PSR's loss calculation.

Honorable Richard J. Sullivan
September 1, 2008
Page 3

counterfeit cases where the counterfeit item sold is substantially equivalent to the infringed item. See, e.g., United States v. Larracuente, 952 F.2d 672, 674 (2d Cir. 1992) (holding that retail value of genuine item was appropriate for "bootleg" videotapes that were "prepared with sufficient quality to permit their distribution through normal retail outlets"); United States v. Darwiche, 04 Cr. 893 (RWS), 2005 WL 3434723, *5 (S.D.N.Y. Dec. 12, 2005) (using retail value of $22,810 for Coach handbags and wallet where defendant sold 31 counterfeit Coach handbags and one counterfeit Coach wallet to an undercover agent for $600 out of his store on West 29th Street); United States v. Cho, 136 F.3d 982, 985 (5th Cir. 1998) (affirming district court's use of retail value of infringed item where defendant sold counterfeit handbags); United States v. Alim, 256 Fed. Appx. 236, 2007 WL 2551564, *4 (11th Cir. Sept. 7, 2007) (upholding use of retail value for counterfeit sports clothing bearing NFL, NBA, and Major League Baseball registered marks where the district court found that a "reasonably informed purchaser would believe that the infringing items were substantially equivalent to the genuine items").

  The defendants submit affidavits of Coach and Christian Dior representatives in which they concluded, based on a review of photographs of a few of the seized bags, that the bags were counterfeit. Amongst other things, the experts relied on what they viewed as the poor quality of the materials used in comparison to the genuine products. But these affidavits do not answer the question of fact that is critical to the Guidelines analysis: namely, whether a reasonably informed purchaser – not an expert – would consider the counterfeit bags identical or substantially equivalent to the genuine item. Cf. United States v. Lozano, 490 F.3d 1317, 1322 (11th Cir. 2007) (noting that the question was whether the infringing item "appeared to an untrained eye to be genuine"). The Court should hold a Fatico hearing to determine this factual question.

  The defendants' arguments that the "retail value" of the counterfeit goods should be used instead of the retail value of the genuine items should be rejected for another reason: there is no evidence of the "retail" price of the counterfeit goods in this case. Defense counsel argue that the price at which the undercover purchased the bags from the defendants – between $12 and $17 per bags - is the appropriate "retail price." Weisenfeld Letter at 2; Van Malden Letter at 2. But the facts demonstrate that the defendants were selling bags on a wholesale basis, not a retail basis. First, the undercover agent purchased far more

Honorable Richard J. Sullivan
September 1, 2008
Page 4

bags than he could possibly want for personal consumption – 36 on the first buy, 56 on the second, 22 on the third, and he ordered over 1000 bags on the fourth buy. When the undercover agent first came into the defendants' store to purchase the bags – May 17, 2006 – he was accompanied by a confidential informant who told the defendants that the confidential informant and the undercover agent needed the bags for a store they were opening in Florida. During the June 7, 2006 buy, the undercover discussed how fast the Burberry bags were selling out of his store in Florida. Moreover, the manner in which the defendants sold the counterfeit bags indicated that they decidedly were not selling the bags on a retail basis out of their store on West 29th Street: only generic bags – not counterfeit ones - were displayed on the walls of the A&B Trading store, and the only way the counterfeit bags could be purchased was to order them from a booklet of pictures of counterfeit bags that was kept hidden under or behind the cash register in the store.

Thus, defendant Zhi Jun Huang's arguments that the average sales price of $20 per bag is 75% less than the genuine item and that the retail value of the counterfeit bags is "not so difficult to set as to unduly complicate the matter," Weisenfeld Letter at 2, proceed from the flawed premise that the wholesale prices the undercover agent paid for the bags constitute the appropriate retail prices. They plainly were not retail prices, and there is currently no record evidence as to what the "retail price" of the infringing items would be, other than the retail value of the infringed items.

II. Angela Huang's Dispute As To Her Leadership Role Enhancement

The PSR concludes that Angela Huang's role as an "organizer, leader, manager, or supervisor" in the offense warranted a two-level increase in her offense level under U.S.S.G. § 3B1.1(c). PRS ¶ 42. The PSR's conclusion was based on the fact that "the defendant was the president and secretary of the companies from which the offence was committed," she had "signatory authority over both accounts and signed numerous checks," and she "rent[ed] the storage room used to store the counterfeit bags." Id. Defendant Angela Huang objects to the enhancement, contending that she was not an organizer, leader, manager, or supervisor. Van Malden Letter at 2. The Government submits that Angela Huang was a leader and organizer of the criminal activity, and that, based on the facts set forth in the PSR, there were five or more participants involved in the

Honorable Richard J. Sullivan
September 1, 2008
Page 5

criminal activity.  Accordingly, a four-level increase is warranted.

Guidelines Section 3B1.1 sets forth role enhancements based on whether the defendant is "an organizer or leader" versus a "manager or supervisor" of criminal activity, and based on the number of participants in the criminal activity.  Application Note 4 to Guidelines Section 3B1.1 sets forth the factors to be considered in distinguishing a leadership and organizational role from one of mere management or supervision:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree or participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Appl. Note 4.

Angela Huang was President of Elite Import USA and was Secretary of Tai Wing International, which was the same company as A&B Trading, and she had signatory authority over both companies' bank accounts.  But these were not empty titles, as defense counsel suggests.  The facts overwhelmingly demonstrate Angela Huang's leadership and control over the criminal activity carried out through these companies.  Compare United States v. Duncan, 42 F.3d 97, 106 (2d Cir. 1994) (company president given leadership enhancement where there was direct and circumstantial evidence that he was aware of, and in some cases, involved in specific corrupt transactions), with United States v. Burgos, 324 F.3d 88, 92-93 (2d Cir.2003) (holding that the defendant was not a manager because he did not exercise control over anyone else and at most acted as a co-equal by offering his services as a stolen-check broker to a coconspirator).

First, Angela Huang was central to the importation side of the business.  She was the primary contact with the Customs' Broker for Elite Import and Tai Wing International/A&B Trading.  It was the Customs' Broker who shepherded the companies' importation of goods through Customs.  Thus, in 2005, when Tai Wing International imported 312 cartons of counterfeit Louis

Honorable Richard J. Sullivan
September 1, 2008
Page 6

Vuitton and Coach bags, with a total retail value of approximately $5 million, it was Angela Huang who corresponded with the Customs Broker regarding that shipment. Indeed, when Customs sent its official notice of seizure of the counterfeit merchandise to Tai Wing, it was Angela Huang who signed the "return receipt" acknowledging acceptance of the letter.[2]

It is plain that Angela Huang was also the person coordinating, on behalf of Elite Import and A&B Trading, the smuggling of counterfeit Burberry bags into the United States, which were subsequently sold out of the A&B Trading store. Undercover customs agents arranged for a "passthrough" of imported counterfeit merchandise, including counterfeit Burberry bags, in April 2006. On April 28, 2006, an undercover customs agent was paid $50,000 in cash in a plastic bag by an unidentified co-conspirator for delivery of the containers of Burberry bags to Elite Trading's warehouse in Brooklyn. The customs agent was told to deliver the bags to a "Mrs. Wong." Another customs agent delivered the bags to "Mrs. Wong."[3] Significantly, some of the bags off-loaded from the delivery truck at Elite Trading's warehouse were then loaded onto a smaller truck with the initials "T.W.I" on the side – for Tai Wing International – and which had a license plate that came back to Elite Trading. The truck was followed, and it delivered the Burberry bags to A&B Trading's storage room on West 29th Street. Since the first undercover purchase in which counterfeit Burberry bags were purchased from A&B Trading took place on May 17, 2006,

---

[2] Angela Huang's role in importation of counterfeit products apparently extended beyond counterfeit bags. In 2005, a company called "Travel Products Trading Inc." attempted to import 630 cartons of Nike shoes, valued at a market price of $567,000. The shipment was detained by Customs as counterfeit. Although Zhi Jun Huang is listed as President of the company in bank records, it was Angela Huang who signed the "return receipt" letter from Customs informing the company that the counterfeit goods has been seized.

[3] The Customs Agent was subsequently shown a photo array with Angela Huang as one of the six photographs in the array. The agent identified two photos stating that one of the two was the "Mrs. Wong" he met when he delivered the bags. One of those two photos was in fact Angela Huang.

Honorable Richard J. Sullivan
September 1, 2008
Page 7

it is a fair inference that the undercover purchased some of the bags smuggled in by Angela Huang on April 28, 2006. See United States v. Proshin, 438 F.3d 235, 238 (2d Cir. 2006) ("Facts relevant to sentencing must be found by a preponderance of the evidence.").

Angela Huang's leadership role is supported by other facts. It is Angela Huang who signed most of Elite Import's checks and most of Tai Wing International's checks. It is also Angela Huang who organized renting the second floor storage room next to A&B Trading where thousands of counterfeit bags and two presses were stored. She approached the landlord to rent the space, signed the lease itself, and delivered some of the rent checks.

At a minimum, Angela Huang was a manager or supervisor in the criminal activity. "A defendant may properly be considered a manager or supervisor if he exercise[d] some degree of control over others involved in the commission of the offense . . . ." United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002) (internal quotation marks omitted). "It is enough to manage or supervise a single other participant." United States v. Al-Sadawi, 432 F.3d 419, 427 (2d Cir. 2005).

Here, Angela Huang was called "Boss" by Bouhari Adoyi - a sales assistant in the A&B Trading store - when Adoyi called out during the June 7, 2006 undercover buy to ask Angela Huang if he could accept money orders instead of cash from the undercover agent for the purchase of the counterfeit bags. Angela Huang answered to that title, and gave permission to Adoyi to accept a combination of cash and money orders. This is sufficient to establish her exercise of control over others for purposes of Section 3B1.1.

The enhancement should be for three or four points under subsections (a) or (b) of 3B1.1, rather than two points under subsection (c) because there were five or more participants in the criminal activity: Angela Huang, Zhi Jun Huang, Fuyin Huang, Bouhari Adoyi, and the unidentified co-conspirator who paid the undercover customs agent $50,000 in cash to bribe customs to allow the shipment of Burberry bags to pass through customs in April 2006.

Honorable Richard J. Sullivan
September 1, 2008
Page 8

### III. Acceptance of Responsibility Points

Defendant Zhi Jun Huang argues that he should be given the third point for acceptance of responsibility because he was not given a Pimentel letter until the day before trial. Despite the disingenuous nature of this claim – at the defendants' request he was given a draft plea agreement rather than a Pimentel three weeks before trial – the Government does not oppose the third acceptance point.

The Government does oppose the third acceptance point as to Angela Huang. Contrary to defense counsel's contention, it was the defendant's equivocation that caused the delay in the defendant entering a plea in this case. The Government had been discussing the Angela Huang's Guidelines with defense counsel at least a month before trial, and provided a Pimentel to defense counsel on May 7, 2008 at defense counsel's request. Angela Huang was scheduled to plead guilty on May 9, 2008, but instead sought to substitute counsel and delay the beginning of the trial on that date, causing additional work for the Government.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____
Antonia M. Apps
Assistant United States Attorney
(212) 637-2198

cc: J. Jeffrey Weinstein, Esq. (counsel for Zhi Jun Huang)
    Stacey Van Malden, Esq. (counsel for Angela Huang)

Burberry

| JPEG | Picture | # of Items | MSRP | Total Price |
|---|---|---|---|---|
|  |  | 2200 | $100 | $220,000 |
|  |  | 302 | $200 | $60,400 |
|  |  | 461 | $225 | $103,725 |
|  |  | 306 | $250 | $76,500 |
| 301614_049 <br> *5/17/2006* <br> *6/7/2006* |  | 13 | $400 | $5,200 |
| 301614_035 <br> *5/17/2006* <br> *6/7/2006* |  | 12 | $400 | $4,800 |
| 301614_065 <br> *5/17/2006* <br> *6/7/2006* |  | 12 | $400 | $4,800 |
| 301614_008 <br> *5/17/2006* <br> *6/7/2006* |  | 12 | $400 | $4,800 |
|  |  |  | Total | **$480,225** |

Christian Dior

| JPEG | Picture | # of Items | MSRP | Total Price |
|---|---|---|---|---|
| 4 | | 171 | $250 | $42,750 |
| 5 | | 144 | $300 | $43,200 |
| 301614_189 6/7/2006 | | 245 | $590 | $144,550 |
| 6/7/2006 | | 406 | $590 | $239,540 |
| | | 404 | $590 | $238,360 |
| 301614_165 6/7/2006 | | 365 | $590 | $215,350 |
| 301614_149 5/17/2006 6/7/2006 | | 575 | $590 | $339,250 |
| | | | Total | **$1,263,000** |

## Coach

| JPEG | Picture | # of Items | MSRP | Total Price |
|---|---|---|---|---|
| 301614_586 | | 210 | $275 | $57,750 |
| 301614_574 | | 15 | $275 | $4,125 |
| 301614_647 *7/24/2006* | | 517 | $275 | $142,175 |
| 301614_660 | | 23 | $200 | $4,600 |
| 301614_071 *5/17/2006* *7/24/2006* | | 16 | $275 | $4,400 |
| 301614_308 | | 2 | $275 | $550 |
| | | 1 | $275 | $275 |
| | | 1 | $275 | $275 |
| 301614_103 *6/7/2006* | | 12 | $275 | $3,300 |
| 301614_680 | | 2 | $275 | $550 |
| 301614_668 | | 1 | $275 | $275 |
| 12 | | 33 | $150 | $4,950 |
| | | | Total | **$223,225** |

Louis Vuitton

| JPEG | Picture | # of Items | MSRP | Total Price |
|---|---|---|---|---|
| 301614_523 | | 28 | $400 | $11,200 |
| 301614_541 | | 24 | $550 | $13,200 |
| 301614_551 | | 337 | $700 | $235,900 |
| 301614_719 | | 47 | $1,300 | $61,100 |
| | | 126 | $685 | $86,310 |
| 7 | | 31 | $200 | $6,200 |
| | | 30 | $750 | $22,500 |
| 6 | | 22 | $300 | $6,600 |
| 8 | | 1 | $1,300 | $1,300 |
| | | | Total | **$444,310** |